IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 14, 2026 Session

**IN RE JADEN H.**

**Appeal from the Chancery Court for Jefferson County**
**No. 20-CV-70        James H. Ripley, Chancellor**

_____

**No. E2024-01825-COA-R3-PT**
_____

In this termination action, the trial court terminated the father's parental rights to his minor child based upon two statutory grounds, finding that those grounds had been proven by clear and convincing evidence. The court also found by clear and convincing evidence that termination of the father's parental rights was in the child's best interest. The father has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY, P.J., E.S., and VALERIE L. SMITH, J., joined.

F. Clinton Little, Knoxville, Tennessee, for the appellant, David H.

Aaron J. Chapman, Morristown, Tennessee, for the appellees, Harold W. and Natalie W.

**OPINION**

I. Factual and Procedural History

On July 18, 2023, the petitioners, Harold W. ("Grandfather") and Natalie W. ("Grandmother") (collectively, "Grandparents"), along with the co-petitioner, Tiffany W. ("Mother"), filed a petition in the Jefferson County Chancery Court ("trial court") seeking to terminate the parental rights of the respondent, David H.

("Father"), to the minor child, Jaden H. ("the Child").[1]  Mother stated in the petition that she consented to the termination of her parental rights and to the Child's adoption by Grandparents.  Grandparents initially asserted two statutory grounds for termination of Father's parental rights:  (1) Father's conduct prior to incarceration exhibiting a wanton disregard for the Child's welfare and (2) Father's failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.

In response to the petition, Father filed a motion for a more definite statement, as well as a "notice of revocation of waiver."  In the latter pleading, Father stated that he was revoking his previous waiver of his right to a timely preliminary hearing regarding an "Ex Parte Protective Order of Custody" that had been entered by the Grainger County Juvenile Court ("the juvenile court") on March 17, 2023.  Father stated that he was specifically asserting his right to a preliminary hearing concerning the *ex parte* custody order.

In this notice, Father explained that he and Mother had never married and that he had initiated custody proceedings concerning the Child in 2020 by filing an emergency petition in the juvenile court.  Father claimed that in those proceedings, he was named the primary residential parent for the Child and was awarded sole custody.  Father also claimed that Mother was incarcerated on drug-related convictions in 2022 and 2023.  Father alleged that in December 2022, he and Grandfather were involved in an altercation during which Grandfather physically assaulted Father and the Child as they were leaving a funeral.  Father asserted that he had subsequently sought an order of protection against Grandfather but that he had abandoned pursuit of the order when he was required to travel to California with the Child for business.

Father claimed that in January 2023, Grandparents had filed a petition in the juvenile court naming both Father and Mother as respondents and seeking a finding of dependency and neglect and an *ex parte* award of custody of the Child.  Father alleged that based on misrepresentations made by Grandparents, the juvenile court had entered an order in February 2023 stating that Father had "not been located but has [a] matter in Jefferson Sessions on 3/17/23" and that service would be attempted on that date.  The matter was reset to March 28, 2023.  On March 17, 2023, Father appeared in court regarding a probation violation and was served with Grandparents' petition.  After Father was sentenced to incarceration due to the probation violation, Grandparents filed a "Motion for Ex Parte Order and Attachment" in the juvenile court, stating that both parents were incarcerated and asking the court to grant them custody of the Child.  According to Father, the juvenile court granted custody to

---

[1] Harold W. and Natalie W. are the Child's maternal grandparents, and Tiffany W. is the Child's biological mother.

- 2 -

Grandparents that same day, even though the Child "was being well-cared for by his paternal grandfather while Father served his ten (10) day sentence."

Father acknowledged that he had initially waived his right to a preliminary hearing following entry of the *ex parte* order in accordance with Tennessee Code Annotated § 37-1-117(b)[2] and that the juvenile court had granted him weekly supervised visits with the Child that were to occur at Parent Place or an equivalent visitation center. Father claimed, however, that Grandparents had blocked his telephone number such that he was unable to reach them to coordinate the visits and that they had filed their termination petition shortly thereafter. Father thus sought to revoke his waiver of a timely preliminary hearing.

Grandparents filed a response to Father's notice, asserting that the trial court did not possess subject matter jurisdiction over procedural matters related to the dependency and neglect proceedings. Grandparents further asserted:

> Pursuant to Tenn. Code Ann. § 37-1-113 Father was not himself entitled to a preliminary hearing within 72 hours of removal because the child was not removed from his care. Nonetheless, preliminary matters were timely heard in the Juvenile Court for Grainger County on March 28, 2023 and June 20, 2023 (a date resulting after continuances were requested by Father's counsel). March 28, 2023 was the next available Juvenile Court day available for hearing following the *Ex Parte* Order of March 17, 2023. Father was represented in the Juvenile Court matter and his attorney waived any objections to those hearings not occurring within 72 judicial hours of any removal. On undersigned counsel's recollection, Father's attorney called for an abrupt adjournment of the preliminary hearing on June 20, 2023 and conclusion of the hearing was pushed back yet again for another month. Because of Father's intervening abandonment of the child becoming manifest, Petitioners sought termination and adoption and the Juvenile Court matter was suspended. Father is being disingenuous if he is claiming to have not been actively involved in the Juvenile Court proceedings.

Grandparents also relied upon Tennessee Code Annotated § 36-1-116(f)(2), which provides that any pending proceedings concerning custody of or visitation with a child who is in the physical custody of the petitioners when a petition for

---

[2] This statutory section provides that "a preliminary hearing shall be held no later than seventy-two (72) hours after the child's removal to determine whether such child's continued removal is required."

termination/adoption is filed "shall be suspended pending the court's orders in the adoption proceeding" and "shall not be heard until final adjudication of the action for termination of parental rights or adoption . . . even if such adjudication . . . will render the custody, guardianship, or visitation action moot." By separate motion, Grandparents sought leave to amend their petition to provide "full procedural clarity."

On February 5, 2024, Grandparents and Mother filed an amended petition, adding factual allegations concerning Father's criminal history, including that Father had pled guilty to (1) drug possession in June 2020, (2) vandalism and harassment in February 2022, and (3) a stalking-related offense and driving without proper child restraints or a license in June 2022. They also alleged that Father had recently been sentenced and incarcerated as a multiple offender for driving under the influence. Grandparents further stated that Father had caused the funeral incident in December 2022 and had then proceeded to "leav[e] [the funeral] in a bizarre manner with the child unrestrained [in his vehicle]." Grandparents and Mother detailed other incidents of Father's behavior that they characterized as "delusional" and indicative of mental illness or substance dependency.

Grandparents claimed that during the juvenile court proceedings, Father took no action to support or visit the Child after Father was released from incarceration. Grandparents also stated that after the Child came to live with them, they had the Child tested for illicit drugs and that the test was positive for recent cocaine exposure, which would have occurred during Father's period of custody. Grandparents restated the same grounds for termination asserted in their original petition and added the grounds of abandonment by willful failure to support and abandonment by willful failure to visit.

The trial court conducted a hearing regarding the pending motions on February 8, 2024. In its resultant order, the court denied Father's request to resume the juvenile court's preliminary proceedings pursuant to Tennessee Code Annotated § 36-1-116(f). The court declared that the amended petition would be deemed filed as of February 5, 2024, because no leave of court was necessary in that Father had not yet filed a responsive pleading. On April 11, 2024, the trial court entered an order appointing a guardian *ad litem* ("GAL") for the Child.

On June 10, 2024, Father filed an answer to the amended petition wherein he denied that he had an "erratic criminal history" or a mental illness. Father further denied that grounds for termination of his parental rights existed. On that same date, Father filed a motion to dismiss the amended petition, asserting that the petition did not contain any material factual allegations. Father further urged that but for the allegedly improper *ex parte* custody order entered by the juvenile court limiting

- 4 -

Father's ability to visit or parent the Child, grounds for termination could not be proven. Father subsequently filed an amended answer containing his verification.

On June 17, 2024, Grandparents filed a response to Father's motion to dismiss, arguing that grounds for termination had been established during the pendency of the juvenile court proceedings due to Father's actions rather than the *ex parte* order entered therein. Father then filed a second motion to dismiss, asserting that his parents, who had filed a petition to intervene in the pending juvenile court proceedings, were indispensable parties to the termination proceeding. Grandparents opposed this motion.

The trial court conducted a trial regarding the termination petition on June 20 and 21, 2024. During that hearing, the trial court heard testimony from Father; Mother; Grandparents; the paternal grandfather; Grandparents' friend, D.H.; and Grandparents' neighbors: J.B., D.B., K.T., and Km.T. Notably, Father testified that he and a friend, who was "a prince in India," owned a jewelry and diamond business, which provided Father with stable income. Father added that he had earned $100,000 from this business during the month prior to trial. He further stated that he had earned $50,000 from the business from October 2023 to February 2024. Despite this income, Father admitted that he had paid no financial support to Grandparents since they had received custody of the Child in March 2023.

Father also acknowledged that he had incurred numerous criminal charges since the Child's birth in June 2019, including driving under the influence, reckless driving, speeding, driving on a revoked license, making threats, trespassing, harassment, and vandalism. Father admitted that he was also charged with and convicted of driving with the Child unrestrained in the vehicle. Father further admitted that he was incarcerated in March 2023 due to a probation violation.

Mother testified that she and Father had been involved in an intermittent relationship for years. She explained that she broke up with Father because he was always asking her to give him money to purchase cocaine. Mother testified that Father dealt in illegal drugs, and she played an audio recording of a conversation she had with Father during her pregnancy wherein he asked her for money and stated that he needed to get someone an "eight ball." According to Mother, Father was still involved with illegal drugs, and she opined that his drug use often made him "paranoid" and gave him delusions of grandeur. Mother presented proof that Father had sent her pictures beginning in January 2024 of Father purportedly traveling in Paris, Dubai, and Switzerland, and she testified that Father had claimed via text messages to be "hanging out" with and dating celebrities.

Mother explained that her parents had helped her with the Child since the Child's birth. Mother admitted that she had been incarcerated by reason of

convictions involving gun charges and a charge of conspiracy to sell cocaine. Mother stated that she became involved in selling illegal drugs when she began dating Father. Mother further articulated that she was surrendering her parental rights to the Child because she believed that Grandparents were most capable of caring for the Child.

Grandparents testified regarding their close relationship with the Child since his birth. Grandfather indicated that the Child had often stayed with them, as much as eighty percent of the time, and at some point before receiving legal custody in 2023, they had the Child in their physical custody for a period of forty-five days in a row. Grandparents explained that the Child was also close to their family, friends, and neighbors; that he was thriving in his current school placement; and that he had many friends who lived nearby. Grandparents stated that they wished to raise the Child as their own and could provide for his needs. In addition, Grandparents, Mother, and other witnesses related that after Grandparents received custody of the Child in 2023, the Child had reported that Father was "mean" to him and that he was afraid of Father.

Grandparents and other witnesses explained that there was a period of months when Grandparents did not know the Child's whereabouts while the Child was with Father during Mother's incarceration. Grandparents had searched for the Child and eventually discovered that he was with Father's parents after Father was incarcerated, at which time they filed a petition for custody in the juvenile court. According to Grandparents, the Child had told them upon his return to their home that Father had been telling the Child that Grandparents were both dead. Grandparents also stated that after receiving custody of the Child, they took him to the dentist, where he underwent thousands of dollars' worth of dental work to preserve his teeth. Grandmother reported that the Child had also failed to gain weight when he was residing with Father. Grandparents further noted that after they obtained custody, Father had not tried to contact them regarding the Child and had paid no financial support.

Grandparents' neighbors and friends testified regarding the Child's close relationship with Grandparents, as well as the Child's close relationship with them and their children and grandchildren. They described the Child as happy in Grandparents' care. They also stated that during the period before the Child had "disappeared" with Father, the Child was often in Grandparents' care. Three of these witnesses reported that upon his return to Grandparents' care, the Child had spontaneously told them that Father had been "mean" to him.

In its resultant order entered on November 6, 2024, the trial court noted that although the paternal grandparents had filed a motion to continue that was heard on the first day of trial, the court had found that the motion was essentially a motion to

intervene filed by unnecessary parties and had denied it. The court also overruled Father's motion to dismiss premised on a finding that the paternal grandparents were indispensable parties. The court determined that the paternal grandparents were not indispensable parties pursuant to Tennessee Code Annotated § 36-1-117(a).

The trial court found that Father had a "substantial criminal record resulting in periods of incarceration." With regard to the statutory ground of abandonment by engaging in conduct prior to incarceration that exhibited wanton disregard for the Child's welfare, the court determined that the amended petition had been filed on February 5, 2024, and that Father had not been incarcerated within the four-month period preceding the amended petition's filing. Accordingly, the court found that this ground had not been proven.

Respecting the statutory ground of failure to manifest, the trial court found that Father had paid no support for the Child during the fifteen months the Child had been in Grandparents' custody despite Father's claim that he had enjoyed "substantial income" from a jewelry business during the same period. Based on Father's testimony at trial, the court concluded that Father had refused to pay support for the Child due to his animosity toward Grandparents. The court thus found that Father had failed to manifest a willingness to assume financial responsibility for the Child.

The trial court further found that placing the Child in Father's custody would pose a risk of substantial harm to the Child due to Father's "history of behaviors and activities . . . often with the Child present, that reflect poor judgment, criminal behavior and uncontrolled impulsivity." As an example, the court recounted Father's choice to "drive 105 [miles per hour], while intoxicated, with the Child improperly restrained in the car," as well as other instances when Father was cited for speeding or driving under the influence with the Child improperly restrained in the car. The court also relied on Father's "substantial history of involvement with illegal drugs—both as a user and a seller." The court noted that evidence had been presented in the form of a voice recording wherein Father had solicited money from Mother in order to purchase drugs for customers, including Father's reference to a customer who needed an "eight ball," which the court recognized as a slang reference to cocaine. The court also noted Mother's testimony regarding Father's use of illegal drugs, which she claimed made Father paranoid and "highly erratic." The court therefore determined that clear and convincing evidence supported the ground of failure to manifest.

Concerning the statutory ground of abandonment by failure to financially support the Child, the trial court found that the four-month determinative period would have begun on October 4, 2023, and ended on February 4, 2024, the day preceding the amended petition's filing. The trial court relied on the same findings

- 7 -

it had made concerning Father's income and his refusal to pay support with respect to the ground of failure to manifest and determined that these findings also provided clear and convincing evidence of Father's willful failure to pay support.

Finally, regarding the alleged ground of abandonment by failure to visit, the trial court utilized the same determinative period. During that timeframe, Father and Mother had the right to weekly supervised visitation, as granted by the order of the juvenile court. Because Father claimed to have tried to exercise his right to visit the Child by contacting the supervising agency but stated that he was unable to arrange visitation, the court found that clear and convincing evidence did not support this ground.

With respect to the Child's best interest, the trial court reviewed the evidence presented in accordance with the twenty statutory best interest factors and determined that the majority of those factors weighed in favor of termination of Father's parental rights. The court specifically noted evidence of Father's involvement with illicit drugs, Father's criminal charges, and the Child's development of severe dental problems during the time that he resided with Father. The court further relied upon a video recording of the Child explaining to a neighbor that he was afraid of Father because Father had placed a pillow over his face, causing the Child to be unable to breathe, and that Father had forced the Child to go under the bed and not come out when Father was watching television.

The trial court terminated Father's parental rights based on clear and convincing evidence of the following statutory grounds: (1) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child and (2) abandonment by failure to financially support the Child. The court also found that clear and convincing evidence demonstrated that termination of Father's parental rights was in the Child's best interest.

Father's notice of appeal was not filed with this Court until December 10, 2024; however, we recognize that the Supreme Court had entered two orders during that timeframe extending filing deadlines for trial courts in the First, Second, Third, and Fourth Judicial Districts due to the impact of Hurricane Helene. *See* In re: Limited Disaster Plan, No. ADM2024-01498 (Tenn. 2024). Accordingly, Father's notice of appeal was timely. *See, e.g.*, *State v. Couch*, No. E2024-01655-CCA-R3-CD, 2025 WL 3731518, at *2 n.1 (Tenn. Crim. App. Dec. 26, 2025). During oral argument in this Court, Father's counsel requested permission to supplement the appellate record to include the paternal grandparents' motion to continue filed during the trial court proceedings.

## II. Issues Presented

Father presents the following issues for our review, which we have restated slightly:

1. Whether the trial court erred by refusing to conduct a preliminary hearing pursuant to Tennessee Code Annotated § 37-1-117(b) after assuming jurisdiction over "all other pending matters concerning the child," based on Tennessee Code Annotated § 36-6-116(f), and thereby denying Father the opportunity to challenge the *ex parte* protective custody order.

2. Whether the trial court erred by terminating Father's parental rights allegedly based on an *ex parte* custody order from pending dependency and neglect proceedings that were never adjudicated.

3. Whether the trial court erred by determining that two statutory grounds for termination were proven when the evidence purportedly demonstrated that Father's inability to support or exercise custody regarding the Child was caused by the *ex parte* custody order.

4. Whether the trial court erred by determining that Father failed to financially support the Child when no support order had been entered.

5. Whether the trial court erred by determining that termination of Father's parental rights was in the Child's best interest.

Grandparents raise the following additional issue:

6. Whether the trial court erred by determining that Father's failure to visit the Child was not willful.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re*

*Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182

S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. *Ex Parte* Order and Preliminary Hearing

For his first two issues, Father argues that the trial court erred by refusing to conduct a preliminary hearing pursuant to Tennessee Code Annotated § 37-1-117(b) after assuming jurisdiction over "all other pending matters concerning the child," based on Tennessee Code Annotated § 36-6-116(f). According to Father, the trial court thereby denied Father the opportunity to challenge the *ex parte* custody order, which he asserts "became the factual and legal foundation for terminating his parental rights."

The *ex parte* order of which Father complains was entered on March 17, 2023, by the juvenile court. We reiterate that Father initially waived his right to a timely preliminary hearing pursuant to § 37-1-117(b) in the juvenile court proceedings, as he acknowledges in his brief. Father only attempted to "revoke" this waiver following Petitioners' filing of a petition to terminate Father's parental rights in the trial court.

The trial court, however, denied Father's request to resume the juvenile court's preliminary hearing pursuant to Tennessee Code Annotated § 36-1-116(f) (West July 1, 2023, to current), which provides in pertinent part:

(1)     Upon the filing of the petition [for termination], the court shall have exclusive jurisdiction of all matters pertaining to the child, including the establishment of paternity of a child pursuant to chapter 2, part 3 of this title, except for allegations of delinquency, unruliness or truancy of the child pursuant to

- 11 -

title 37; provided, that, unless a party has filed an intervening petition to an existing adoption petition concerning a child who is in the physical custody of the original petitioners, the court shall have no jurisdiction to issue any orders granting custody or guardianship of the child to the petitioners or to the intervening petitioners or granting an adoption of the child to the petitioners or to the intervening petitioners unless the petition affirmatively states, and the court finds in its order, that the petitioners have physical custody of the child at the time of the filing of the petition, entry of the order of guardianship, or entry of the order of adoption, or unless the petitioners otherwise meet the requirements of § 36-1-111(d)(6).

(2)     Except for proceedings concerning allegations of delinquency, unruliness, or truancy of the child under title 37, any proceedings that may be pending seeking the custody or guardianship of the child or visitation with the child who is in the physical custody of the petitioners on the date the petition is filed, or where the petitioners meet the requirement of § 36-1-111(d)(6), shall be suspended pending the court's orders in the adoption proceeding, and jurisdiction of all other pending matters concerning the child and proceedings concerning establishment of the paternity of the child shall be transferred to and assumed by the adoption court; provided, that until the adoption court enters any orders affecting the child's custody or guardianship as permitted by this part, all prior parental or guardian authority, prior court orders regarding custody or guardianship, or statutory authority concerning the child's status shall remain in effect. Actions suspended by this section, regardless of the stage of adjudication, shall not be heard until final adjudication of the action for termination of parental rights or adoption regarding the same child, even if such adjudication of the termination of parental rights or adoption will render the custody, guardianship, or visitation action moot.

(Emphasis added.) Accordingly, the trial court maintained exclusive jurisdiction concerning "all matters pertaining to" the Child. *See* Tenn. Code Ann. § 36-1-116(f)(1). As the trial court correctly determined, the juvenile court proceedings concerning custody and visitation were suspended upon Petitioners' filing of the termination petition. *See* § 36-1-116(f)(2). Thus, the juvenile court proceedings could not be heard until final adjudication of the termination action even though the

- 12 -

termination action could possibly (and ultimately did) render the juvenile court proceedings moot. *See* § 36-1-116(f)(2); *see also In re K.A.Y.*, 80 S.W.3d 19, 26 (Tenn. Ct. App. 2002) (holding that based on § 36-1-116(f)(2), the trial court was not required to decide the former foster parents' previously filed custody petition before ruling on the adoptive parents' termination petition). Therefore, the trial court did not err in declining to hear the juvenile court proceedings after the termination petition was filed.

V. Statutory Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2023, to current)[3] lists the statutory requirements for termination of parental rights, providing in relevant part:

> (a)　The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
> * * *
>
> (c)　Termination of parental or guardianship rights must be based upon:
>
> > (1)　A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> >
> > (2)　That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court concluded that the evidence clearly and convincingly supported two statutory grounds to terminate Father's parental rights: (1) failure to manifest an ability and willingness to assume legal and physical custody of or

---

[3] Unless otherwise noted, all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the operative termination petition was filed and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4 n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, the subsection that was in effect at the time the operative termination petition was filed has not changed and therefore remains current.

financial responsibility for the Child and (2) abandonment by failure to financially support the Child. We will address each statutory ground in turn.

### A. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Child

The trial court found clear and convincing evidence establishing that Father had failed to manifest an ability and willingness to assume custody of or financial responsibility for the Child. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) provides that a parent's rights may be terminated when:

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, Petitioners were required to show, by clear and convincing evidence, that (1) Father failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Father's custody would pose a risk of substantial harm to the Child's welfare. *See In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

As to the first prong of this statutory ground, our Supreme Court has instructed:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d at 677 (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). Concerning the "substantial harm" requirement of the second prong, this Court has observed:

- 14 -

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)) (footnotes omitted in *Maya R.*).

Here, the trial court found that the first prong of this ground had been established by clear and convincing evidence as to Father based upon Father's failure to provide financial support for the Child during the fifteen-month period that the Child had been in Grandparents' custody. Father acknowledged at trial that he had paid nothing to Grandparents during the entire time they had maintained custody of the Child beginning in March 2023. Father also acknowledged that during that same timeframe, he had earned significant income from a jewelry business, claiming to have made $50,000 in 2023 and $100,000 in May 2024.

When questioned further about his failure to provide financial support, Father responded: "And why should I pay people to be a piece of crap to me?" As the trial court found, Father's testimony established that he had no intention of paying support to Grandparents due to his "animosity toward" them and that despite his income, Father had withheld support for the Child "for selfish reasons." We agree. Father made clear during his testimony that his refusal to pay support for the Child was willful and deliberate. We therefore conclude that the evidence preponderates in favor of the trial court's finding that Father failed to manifest a willingness to assume financial responsibility for the Child.

Concerning the second prong of this ground, the trial court found that placing the Child in Father's custody would pose a risk of substantial harm to the Child due to Father's "history of behaviors and activities," "often with the Child present, that reflect poor judgment, criminal behavior and uncontrolled impulsivity." The evidence preponderates in favor of this finding. Petitioners presented evidence of Father's lengthy history of criminal charges, including driving under the influence with the Child improperly restrained in the vehicle, drug-related offenses, threatening behavior, harassment, trespassing, and vandalism. Mother testified regarding Father's involvement in the sale of illegal

- 15 -

drugs during their relationship, and she claimed to have been offered cocaine by Father in May 2023. In addition, we note that several witnesses testified to the Child's statements after being removed from Father's custody that he was afraid of Father and that Father was "mean" to him. Furthermore, the evidence was undisputed that the Child came into to Grandparents' custody demonstrating signs of having experienced poor nutrition while in Father's care.

Moreover, several witnesses testified that the Child was strongly bonded with Grandparents and happy and thriving in Grandparents' custody. This Court has previously determined that removing a child who has "bonded and thrived" with the Child's current family amounts to substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (determining that the child would be at risk of substantial psychological harm if custody were restored to the father, who had been apart from the child for some time); *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (concluding that placing the children in the mother's custody would put them at risk of substantial harm because the children were "very young" when they were removed and had "little to no contact" with the mother for more than a year). We therefore conclude that the evidence preponderates in favor of the trial court's determination that the statutory ground of failure to manifest an ability and willingness to assume custody of or financial responsibility for the Child was proven by clear and convincing evidence.

Regarding Father's postulate that this ground was "based on" the juvenile court's *ex parte* order, we find such argument unavailing. Although entry of the *ex parte* order was a preceding event, it was not the cause of Father's decision to withhold financial support for the Child. It was also not the cause of Father's decision to engage in criminal behavior that resulted in his incarceration for a probation violation. As his trial testimony demonstrated, Father often appeared to shift the blame for his own behavior onto others. Significantly, however, Father acknowledged during trial that he had the means to pay support but willfully declined to do so, thus establishing grounds for termination of his parental rights. We therefore affirm the court's determination concerning this ground.

### B. Statutory Abandonment by Failure to Financially Support

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (West July 1, 2022, to current), provides as relevant to this action:

> (g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so

- 16 -

that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

> (1)    Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

Tennessee Code Annotated § 36-1-102(1)(A) provides the following definition of abandonment as pertinent here:

> For purposes of terminating the . . . rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> > (i)(*a*) If the child is four (4) years of age or more, for a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Petitioners first alleged the abandonment grounds in the amended termination petition filed on February 5, 2024. Accordingly, the trial court determined that the four-month determinative period relevant to this ground began on October 4, 2023, and ended on February 4, 2024. However, the trial court should have set the beginning date as October 5, 2023, rendering a statutorily determinative period spanning October 5, 2023, through February 4, 2024 ("Determinative Period"). *See In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016) (explaining that the applicable four-month statutory period preceding filing of the termination petition "began on March 8, 2011, and concluded on July 7, 2011, the day prior to the filing of the termination petition") (citing *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014)). Because we find that this one-day difference in the beginning of the Determinative Period does not affect our analysis of this statutory ground, we conclude that the trial court's inclusion of the extra day constitutes harmless error. *See, e.g.*, *In re Kierani C.*, No. E2020-00850-COA-R3-PT, 2021 WL 4057222, at *8 (Tenn. Ct. App. Sept. 3, 2021).

As explained in the previous section of this Opinion, Father willfully failed to provide financial support for the Child due to his animosity toward Grandparents.

Father acknowledged having earned significant income during the Determinative Period, yet he intentionally declined to provide any support for the Child, as he admitted during his testimony at trial. Father now asserts that he was justified in failing to pay support because no order of support had been entered. However, it is well settled in Tennessee that a parent maintains an obligation to provide child support and is taxed with knowledge of that obligation even in the absence of a court order. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"); *State Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004) ("In Tennessee . . . the obligation to pay [child] support exists even in the absence of a court order to do so.") (citation omitted). Therefore, we affirm the trial court's determination that clear and convincing evidence established that Father had abandoned the Child by failing to provide financial support for him during the Determinative Period.

### C. Statutory Abandonment by Failure to Visit

Grandparents assert that the trial court erred by failing to determine that they had also proven the statutory ground of abandonment by failure to visit by clear and convincing evidence. The evidence was undisputed that Father did not visit the Child during the Determinative Period despite having been granted the right to weekly supervised visitation by the juvenile court. However, as the trial court found, Father testified that he had attempted to exercise his right to supervised visitation "through the supervising agency on several occasions to no avail." The court acknowledged that the evidence on this ground was conflicting and found that the testimony was "irreconcilable."

Grandparents contend that because Father failed to raise lack of willfulness as an affirmative defense in his answer, he has waived the absence of willfulness as a defense to the ground of abandonment by failure to visit. *See* Tenn. Code Ann. § 36-1-102(1)(I) ("The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure."); Tenn. R. Civ. P. 12.08 (specifying that, in general, defenses not raised by motion or answer are waived); *see also In re Ashlynn H.*, No. M2020-00469-COA-R3-PT, 2021 WL 2181655, at *4 (Tenn. Ct. App. May 28, 2021) (finding that a parent who failed to plead the absence of willfulness in his response to the petition to terminate parental rights had waived it as a defense to the ground of abandonment by failure to support).

Notwithstanding, in a termination case involving a similar circumstance, this Court has previously held that when the petitioners failed to object to evidence presented at trial concerning the parent's alleged lack of willfulness relative to the ground of abandonment through failure to visit, the defense was tried by implied consent. *See In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712,

- 18 -

at *8 (Tenn. Ct. App. Nov. 10, 2021). In *Lauren F.*, the petitioners had alleged that the father's parental rights should be terminated based on, *inter alia*, abandonment through failure to visit the child. *See id.* at *1. The father did not raise the affirmative defense of the absence of willfulness in his answer or via motion. *Id.* at *2. Moreover, the father did not raise any issue on appeal concerning the grounds for termination. *Id.* at *5. Despite these deficiencies, this Court determined that the issue of willfulness had been tried by implied consent inasmuch as the petitioners had failed to object to testimony regarding willfulness at trial and had provided testimony concerning "Father's requests to visit the child and their response to his request[s] at length." *Id.* at *8. This Court then proceeded to analyze the willfulness issue on appeal. *See id.*; *see also* Tenn. R. Civ. P. 15.02 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."); *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997) ("Implied consent hinges on the issues that were actually litigated by the parties, and the failure to amend or to request to amend is not dispositive.").

Similarly, here, Father was questioned by counsel and allowed to testify at length during the trial concerning his attempts to contact Parent Place, Volunteer Visitation (another visitation provider), Grandparents, and Mother regarding visits with the Child.[4] In addition, Mother and Grandparents were questioned regarding whether they had been contacted by Father or Parent Place regarding visitation. As such, we determine that the issue of willfulness was tried by implied consent. *See In re Lauren F.*, 2021 WL 5234712, at *8. We will therefore proceed to analyze the willfulness issue concerning abandonment through failure to visit.

With regard to any claim of lack of willfulness, Father bore the burden of proof by a preponderance of the evidence. *See* Tenn. Code Ann. § 36-1-102(1)(I) ("The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence."). "Willfulness" has previously been explained in the context of parental termination actions as follows:

> Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so,

---

[4] Father testified that his contacts concerning visitation occurred during the months of July through October in 2023.

makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child[.]

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (citations and footnotes omitted); *see In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control.").

Upon our review of the evidence, we determine that Father demonstrated that his lack of visitation was not willful. Father testified that he had attempted to contact Parent Place and Volunteer Visitation on numerous occasions to arrange a visit with the Child but that he was unsuccessful. Father also claimed that he was unable to contact Grandparents or Mother and believed that they had blocked his phone number. Grandparents denied this allegation, stating that Father had not attempted to contact Grandparents. However, Father's testimony regarding his contact with Parent Place and Volunteer Visitation was unrefuted, and Mother admitted that she had received a call from Volunteer Visitation in May 2024. We therefore determine that the evidence does not preponderate against the trial court's conclusion, by clear and convincing evidence, that Petitioners failed to prove the ground of abandonment by willful failure to visit.

VI. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before

concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2021, to current) lists the following factors for consideration:

    (A)    The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

    (B)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

    (C)    Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

    (D)    Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

    (E)    Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

    (F)    Whether the child is fearful of living in the parent's home;

    (G)    Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

    (H)    Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

    (I)    Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)    Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)    Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)    Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)    Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)    Whether the parent has ever provided safe and stable care for the child or any other child;

(P)    Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)    Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)    Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the

- 23 -

best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the case at bar, the trial court considered the statutory best interest factors and determined that a majority of the factors weighed in favor of terminating Father's parental rights. The trial court accordingly concluded that termination of Father's parental rights was in the Child's best interest. Upon careful review, we determine that the trial court's findings regarding the best interest factors are supported by a preponderance of the evidence.

The trial court reviewed factors (A) (the effect termination would have on the child's need for stability), (B) (the effect a change of caretakers would have on the child), and (H) (the child's attachment to other persons in the parent's absence) together, finding that they all related to the Child's need for stability. The court found that the Child had an "emotionally significant attachment" to Grandparents and that his critical need for stability was being met in their custody. The court also found that a change in custodians would be detrimental to the Child's emotional health "given the extended term of the Child's residence [with Grandparents], his age, and [his] strong bond with" Grandparents. We agree. By the time of trial, the Child had resided with Grandparents for approximately fifteen consecutive months, and the evidence demonstrated that the Child had also spent significant time in Grandparents' care before Father had begun to keep the Child away from Grandparents. Several witnesses testified that the Child was happy and thriving in Grandparents' care, that he enjoyed a close bond with them, and that he had expressed fear of Father. We therefore conclude that these factors weigh in favor of termination.

The trial court found that factors (C) (the parent's demonstration of continuity in meeting the child's needs), (F) (whether the child was fearful of living in the parent's home), and (N) (whether the parent had abused or neglected the child)

also weighed in favor of termination due to the fact that Father did not enjoy a healthy parental bond with the Child[5] and because the Child had expressed fear of Father, who he reported had been "mean" to him. The court noted that during the few months the Child had resided with Father, the Child had developed "severe, neglected and untreated dental problems." The court also noted that the Child had reported to several witnesses that Father had placed a pillow over his face such that he could not breathe. The evidence was clear that Father had failed to meet the Child's needs and had been neglectful and potentially abusive to the Child when the Child resided with him such that the Child had expressed fear of Father to multiple witnesses. Father's actions also resulted in the lack of a healthy parent/child attachment. Similarly, the trial court found that factor (O) (whether the parent had ever provided safe and stable care for the child) also militated in favor of termination for the same reasons. We agree with the trial court that these factors weigh in favor of termination.

The trial court likewise found that factors (J) (whether the parent has demonstrated a lasting adjustment of conduct or circumstances to make it safe for the child to be in the parent's home) and (K) (whether the parent has taken advantage of available services or resources to assist in making a lasting adjustment) supported termination. The court found that Father had made no adjustment of his conduct that would favor his continuing relationship with the Child despite "overwhelming" evidence that Father was a drug dealer or user. The court noted that rather than "admitting and addressing his substance abuse problems and seeking help," Father had continued his self-destructive behavior. We agree with the trial court that Father had not taken advantage of services that could help address his substance issues and had not demonstrated a change in conduct that would make it safe for the Child to be with him. Accordingly, these factors also weigh in favor of termination.

Concerning factor (S), which addresses whether the parent has consistently provided more than token financial support, the evidence was undisputed that Father had provided no support for the Child whatsoever since the Child had been placed in Grandparents' custody. Moreover, as the trial court emphasized, Father admitted that he had withheld such support due to his animosity toward Grandparents. The trial court aptly observed:

> The fact that [Father] is unwilling to set aside such animosity in favor of supporting the Child is clear and convincing—indeed, *compelling*—evidence of his unwillingness, or inability, to place the

---

[5] Although the trial court failed to directly refer to factor (D), concerning whether the parent and child enjoyed a secure and healthy parental attachment, the court made findings regarding the lack of such attachment and the court's belief that Father would be unable to create such an attachment. Ergo, we conclude that the court also considered factor (D) in its analysis.

- 25 -

interests of the Child above his own. Simply put, he values his own interests above those of his Child.

We agree with the trial court's assessment of the evidence concerning this factor.

The trial court made no findings regarding factor (E) (whether the parent had maintained visitation or contact with the child), (L) (whether the Department of Children's Services had made reasonable efforts to assist the parent), (Q) (whether the parent had demonstrated a commitment to creating a home in which the child could thrive), and (R) (whether the parent's home was safe and healthy for the child). However, factors (L), (Q), and (R) were largely inapplicable or neutral because the Department was not a party to this action and little evidence was presented regarding the physical environment of Father's home. Based on the trial court's determination that abandonment by failure to visit had not been proven by clear and convincing evidence, we determine that factor (E) weighs against termination because Father had demonstrated a lack of willfulness concerning his failure to visit.

However, other factors that the trial court failed to specifically mention, including (I) (whether the child had significant relationships with persons other than caregivers), (M) (whether the parent had demonstrated a sense of urgency in addressing the conditions that made an award of custody to that parent unsafe), (P) (whether the parent had demonstrated an understanding of the child's basic needs), and (T) (whether the parent's mental or emotional fitness would be detrimental to the child), would militate in favor of terminating Father's parental rights. The evidence established that Father had failed to demonstrate urgency in addressing the circumstances that rendered it unsafe for him to maintain custody of the Child, including his substance abuse and criminal behaviors. Father provided no proof that he had sought an alcohol and drug assessment or attended any type of drug rehabilitation, and he continued to accrue criminal charges and behave recklessly throughout the Child's life.

Father clearly failed to understand the Child's basic needs for stability, proper nutrition, and hygiene, as evinced by the Child's failure to gain weight when he resided with Father and his need for immediate, extensive dental care upon his return to Grandparents' care. Father's mental and emotional fitness was repeatedly called into question during trial based upon, *inter alia*, his grandiose claims regarding his "diamond" business and other implausible assertions evinced by his test messages to Mother, his claims on the property of others as his own, and his claim that Grandfather had spearheaded a conspiracy to strip him of his parental rights. Finally, the evidence demonstrated that the Child enjoyed significant relationships with Grandparents' extended family, friends, and neighbors. We

- 26 -

therefore conclude that factors (I), (M), (P), and (T) weigh in favor of termination as well.

The evidence preponderates in favor of the trial court's conclusion that clear and convincing evidence established that termination of Father's parental rights was in the Child's best interest. We therefore affirm the trial court's judgment in that regard.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in its entirety. Father's motion (made during oral argument) to include the paternal grandparents' motion to continue in the technical record is denied as moot. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, David H.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE